UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,        )
                                 )
                 Plaintiff,      )
                                 )
v.                               )        No. 3:10-CR-44
                                 )        (JORDAN/GUYTON)
FELIX BOOKER,                    )
                                 )
                 Defendant.      )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate.  This case is now before the Court on the Defendant's Motion to Suppress

Evidence Obtained During Unconstitutional Compelled Body Cavity Search [Doc. 11] and Motion

to Suppress Statements [Doc. 13], both filed on June 24, 2010.  The parties appeared before the

undersigned for a hearing on the Defendant's Motions on July 28, 2010.  Assistant United States

Attorney Alexandra Hui was present on behalf of the Government.  Attorney Robert Jolley, Jr., was

present on behalf of the Defendant, who was also present.

## I.    FACTS

Based on the testimony and evidence presented at the suppression hearing on July 28, 2010,

the Court makes the following findings of fact.[1]  On February 12, 2010, Officer Daniel Steakley of

the Oak Ridge Police Department was on patrol with his drug detection dog, "Argo," in Oak Ridge,

Tennessee.  [Tr. 13].  At around 11:00 a.m., Steakley took a break from patrol duties to eat lunch

at a local Chick-Fil-A with another officer of the Oak Ridge Police Department.  [Tr. 40].  While

eating lunch, Steakley noticed a vehicle in the restaurant parking lot with expired registration tags.

[Tr. 13, 40].  Because he "had just sat down to eat lunch," Steakley decided not to immediately go

outside and stop the vehicle.  [Tr. 41].

Approximately 30 to 45 minutes later, while back on patrol, Steakley spotted the same

vehicle with expired tags turning from South Benedict Avenue onto Tuskegee Drive in Oak Ridge.

[Tr. 13].  Steakley pursued the vehicle as it turned left from Tuskegee Drive onto Tulsa Road, and,

at approximately 11:50 a.m., he initiated a traffic stop to investigate the expired tags.  [Tr. 41];

[Exhibit 6 (showing that Steakley placed a call to the Oak Ridge Police Department when he

initiated the traffic stop at 11:49:54 a.m.)]; [Exhibit 3 (the cruiser video shows the vehicle coming

to a stop at 11:49:54 a.m.)].  Steakley approached the driver-side of the vehicle to make contact with

the driver, Mr. William "Taavian" Booker (hereinafter "Booker").  [Tr. 14]; [Exhibit 3].  When

Steakley reached the driver door, he realized that the driver window was broken and could not be

opened.  [Tr. 15].  Steakley asked Booker to exit the vehicle, and Booker did so.  When Booker

opened the door, Steakley immediately "observed the odor of fresh marijuana coming from the

vehicle."  [Tr. 15].

Because of the smell, Steakley asked Booker if there were "any illegal narcotics" in the

---

[1] The Court notes that much of the factual background that is alleged in the parties' memoranda was not established by the testimony and exhibits presented at the hearing.  The findings of fact set out here in part I are limited to those facts in the record of the suppression hearing.

vehicle. [Tr. 15]. Booker stated that there were not. [Tr. 15]. Booker also told Steakley that he could search the vehicle if he wanted to. [Tr. 15]. At this point, Steakley returned to his cruiser to check Booker's driver's license against records in the police database. [Tr. 15]. While checking the database, Steakley observed the Defendant, who was seated in the passenger seat of the stopped vehicle, "moving around as if he was attempting to conceal something." [Tr. 15]. Steakley described the Defendant's movement as follows: "[He was] shifting [his] weight around in the seat. I could see his head moving. I could see his shoulders moving." [Tr. 56]. At some point during the records check, Officer Lewis Ridenour of the Oak Ridge Police Department arrived on the scene as a backup officer. [Tr. 16].

When Steakley finished the records check, he retrieved Argo from the back of his cruiser. Steakley asked Booker to get back into the stopped vehicle and shut the door. Steakley and Argo then conducted a drug detection sniff of the vehicle. [Exhibit 3] (cruiser video shows the drug detection sniff begin at approximately 11:57:35 a.m.). Steakley testified that Argo exhibited a "distinct change in behavior" when he sniffed the area around the driver door seam. [Tr. 17, 30]. Steakley more specifically testified that Argo made a "sharp head check" as he walked past the seam. [Tr. 30]. The video recording of the traffic stop clearly shows Argo sharply turning his head just after he walks past the driver door at approximately 11:57:43 a.m. [Exhibit 3].

After walking Argo along the driver-side of the vehicle, Steakley brought him to the passenger-side to continue the sniff.[2] [Tr. 17, 30]. Steakley testified that Argo again exhibited a "distinct change in behavior" when he sniffed the area around the passenger door seam. [Tr. 17, 30].

---

[2] This portion of the drug detection sniff is not visible on the video recording of the traffic stop. [Exhibit 3].

-3-

Steakley further testified that immediately after exhibiting a change in behavior, Argo alerted to the presence of the odor of narcotics by laying down next to the passenger door.[3] [Tr. 17, 30]. After Argo's alert, Steakley asked the Defendant to exit the vehicle. [Tr. 17]. Steakley then performed a pat down of the Defendant's outer clothing to check for weapons. [Tr. 18]. When Steakley patted the Defendant's "buttocks area" he felt the Defendant "clench[] his butt together."[4] [Tr. 18, 56, 57]. During the pat down Steakley also felt "two large bulges" in the Defendant's pants pockets. [Tr.

---

[3] Steakley explained that Argo is "a passive alert dog," which means that he is trained to alert to the presence of narcotics by exhibiting a specific "passive" trained response. [Tr. 17]. Steakley testified that Argo is trained to alert by laying down. [Tr. 17].

[4] Steakley testified that he had participated in a prior investigation of the Defendant in 2009. [Tr. 48]. This investigation culminated with Steakley arresting the Defendant and performing a full search of the Defendant's person as an incident to the arrest. During the search, Steakley discovered 23 grams of marijuana hidden on the Defendant's person beneath his underwear. See [Tr. 57]; [Exhibit 5] (forensic chemistry report showing that the Defendant was arrested with 23 grams of marijuana in Oak Ridge Police Department case number 200901015). Steakley testified that this prior experience searching the Defendant's person heightened his suspicion when he felt the Defendant "clench[] his butt together" during the pat down on February 12, 2010. [Tr. 18-19]. He explained as follows:

> When I was patting him down [on February 12, 2010,] when I started patting him down when I got to his buttocks area he had clenched his butt together. When he done that, from a prior investigation with the Defendant I immediately recalled that [] same situation. I had gotten him out to pat him down. He done the same thing and after further investigation 13 bags of marijuana was recovered from his butt crack.

[Tr. 18-19].

The Court notes that Steakley's testimony is somewhat inconsistent with regard to precisely where he discovered marijuana hidden on the Defendant's person during the search incident to arrest in 2009. As quoted above, Steakley first testified that marijuana was "recovered from [the Defendant's] butt crack." [Tr. 19]. But on cross examination, Steakley testified that he discovered marijuana tucked behind the Defendant's scrotum in the crotch where his legs meet. [Tr. 57 (When Steakley was asked if he recovered the marijuana from "beneath [the Defendant's] scrotum," he responded, "Pretty much. Yes, sir.")].

17].  Steakley reached into the pockets and removed two bundles of cash.  [Tr. 17].  Steakley placed each bundle into an evidence bag and then instructed the Defendant to sit on the hood of his police cruiser.  [Tr. 19, 48].

Steakley next searched the stopped vehicle and discovered three plastic baggies on the front passenger-side floorboard.  [Tr. 19].  One baggie contained 0.06 grams of marijuana, the second baggie contained "a green plant-type residue" that Steakley recognized as marijuana residue, and the third baggie was covered with a "powder residue."  [Tr. 19-20].  Steakley also discovered what appeared to be "crumbled up marijuana" loose on the front passenger-side floorboard.  [Tr. 19].  Steakley seized the three baggies, but did not collect any of the loose "crumbled up marijuana."  [Tr. 45].  After Steakley's search, the Defendant was arrested, handcuffed behind his back, and placed in the back seat of Ridenour's cruiser.  [Tr. 20, 58, 59, 79, 80].  Booker was allowed to leave, and he was not issued a citation for driving a vehicle with expired registration tags.  [Tr. 41, 45]; [Exhibit 3 (cruiser video shows Booker get back into the stopped vehicle to leave at 12:17:35 p.m.)].

At approximately 12:19 p.m., Ridenour left the scene and transported the Defendant to the Oak Ridge Police Station.  [Exhibit 6]; [Tr. 80, 98].  Upon arriving at the Station at 12:21 p.m., Ridenour placed the Defendant in an interview room.  [Tr. 21, 80]; [Exhibit 6].  Shortly afterwards, Steakley arrived at the station and began speaking with the Defendant.  [Tr. 21].  Steakley testified that before starting a conversation he first "advised [the Defendant] of his rights."  [Tr. 21].  Steakley testified that the Defendant stated that he understood his rights.[5]  [Tr. 21].  Steakley

_____

[5] Steakley testified as follows:

> As soon as I made contact with [the Defendant], I advised him of his rights.  I asked him did he understand and did he wish to speak to me.  He stated that he did understand and he did want to speak with me.

[Tr. 22].

explained that he carries a card issued by the police department that lists the rights guaranteed to an arrestee. [Tr. 22]. Steakley testified that he read that card out loud to the Defendant. [Tr. 22, 63]. Steakley did not ask the Defendant to sign a standard rights waiver form. [Tr. 22, 63].

Steakley talked to the Defendant and asked him a few questions. The Defendant said that he was employed pouring concrete and was paid in cash. [Tr. 22]. He then repeatedly asked to be released with a citation, and he offered to forfeit his rights to the bundles of cash that were found in his pockets. [Tr. 23]. After a brief conversation, Steakley left the interview room to complete "seizure paperwork." [Tr. 23-24]. Ridenour stood watch over the Defendant from the hallway in front of the interview room. [Tr. 23-24, 80]. Ridenour testified that the Defendant, while in the interview room, "continued to fidget and try to put his hands in the back of his pants." [Tr. 81]. Ridenour entered the room and "moved [the Defendant's] cuffs around to the front of his person." [Tr. 81].

Shortly after Ridenour went back into the hallway, the Defendant slammed the door to the interview room and pressed his body against it in an attempt to barricade himself inside. [Tr. 24, 67, 80, 82]. Ridenour, Steakley, and a third Oak Ridge police officer, Sergeant John Kelly, forced the door open and wrestled the Defendant to the ground. [Tr. 24, 82]. After regaining control of the Defendant, Steakley patted him down and then "took his pants and just shook them to see if there was anything in there that would fall out." [Tr. 68]. Steakley explained as follows: "We basically pulled [the Defendant's] pants up to where they became loose on him again and then jarred them to try to [see] if anything was inside of his pants or in [his] boxers [so] that it would fall out." [Tr. 68, 84]. Steakley and Ridenour then searched the interview room. [Tr. 24, 67]. Neither the pat down nor the search yielded any contraband. [Tr. 24, 68, 83].

At 1:20 p.m., Ridenour left the Oak Ridge Police Station and transported the Defendant to the Anderson County Detention Facility in Clinton, Tennessee. [Exhibit 6]; [Tr. 84, 98]. Ridenour testified that during the drive the Defendant "continued to move about in the back seat" of the cruiser. [Tr. 85]. Ridenour explained that the Defendant was ducking out of view of the rearview mirror. [Tr. 85]. Upon arrival at the Detention Facility, Ridenour took the Defendant through the sally port and into the booking intake "trap." [Tr. 85]. Ridenour then went to the adjacent "officer's room" to talk with the correctional officers who would be booking the Defendant.[6] [Tr. 85]. Deputy Jerry Shelton of the Anderson County Sheriff's Office performed a pat down search of the Defendant in the trap and then entered the officer's room to speak with Ridenour. Ridenour told Shelton that the Defendant "may have some contraband on his person, particularly in his buttocks area."[7] [Tr. 86].

---

[6] The officer's room has a window overlooking the trap area where an arrestee stands while awaiting booking.

[7] The specifics of the conversation between Ridenour and Shelton are unclear. Ridenour testified that he told Shelton that the Defendant "may have some contraband on his person, particularly in his buttocks area," [Tr. 86], but did not expressly ask Shelton to perform a strip search of the Defendant, [Tr. 100]. Shelton testified about his conversation with Ridenour as follows:

> [I] was asked if I would do a strip search. I said, "Yes, we can do a strip search." I found out the reasoning behind it. We just don't ordinarily go out and do a strip search. He told me there was possible contraband. I said, "Okay, we can do that." I had another officer with me. We do it with two officers. We took him into an enclosed room for privacy and did a strip search there. . . .

> Officer Ridenour informed me that it's possible that this individual had some kind of contraband on him because he got away from them at their station. [Ridenour] did not have visual contact on him for a certain amount of time [at the station], a small amount of time.

[Tr. 106-07].

Based on his conversation with Ridenour, Shelton decided to perform a strip search of the Defendant before booking him into the Detention Facility. [Tr. 86]. The Defendant was led from the trap into a room where newly booked inmates are taken for a shower and "dress out." [Tr. 86]. Shelton then ordered the Defendant to undress by removing one article of clothing at a time. [Tr. 107]. Shelton checked each article of clothing after it was removed. [Tr. 107-08]. Once the Defendant was naked, Shelton visually checked the Defendant's body. [Tr. 108-09]. Shelton ordered the Defendant to "lift up [his] front genitals" to expose his crotch. [Tr. 108-09]. Shelton then ordered the Defendant to bend over to reveal his anus. [Tr. 109]. The Defendant "only slightly made a bend," so Shelton ordered him to bend over further and use his hands to pull his buttocks apart. [Tr. 109]. The Defendant complied. [Tr. 109]. Shelton testified that when the Defendant spread his buttocks, "a small string protruding from the [Defendant's] anus" was visible. [Tr. 109].

Shelton asked the Defendant about the string, and the Defendant immediately moved his hand behind his body. [Tr. 109-10]. Shelton believed that the Defendant was attempting to use his fingers to push an object into his rectum. Shelton explained as follows: "I seen the hand going upward. I said, 'He is trying to push it up in him.'" [Tr. 110]. Shelton and another officer tried to restrain the Defendant. [Tr. 110]. The Defendant resisted and a scuffle began. [Tr. 110]. Four other correctional officers came to aid Shelton and his colleague in subduing the Defendant. [Tr. 111] (Shelton testified that six officers including himself aided in regaining control of the Defendant). One of the officers used mace on the Defendant. [Tr. 116-17, 161]. Once the

---

On cross examination, Shelton testified that "Officer Ridenour asked if it was possible to do a strip search on [the Defendant]." [Tr. 115]. Shelton also testified that his supervisor at the Detention Facility ordered him to perform a strip search of the Defendant "if necessary." [Tr. 115]. When asked if he would have gone further than a pat down search of the Defendant without Ridenour's request for a strip search, Shelton stated, "Probably not." [Tr. 118].

Defendant was restrained, Shelton contacted his supervisor for advice about how to proceed. [Tr. 111-12]. Shelton told his supervisor that he thought that there was "some type of drug up [the Defendant's] rear end." [Tr. 111-12]. Shelton's supervisor instructed him to take the Defendant immediately to the hospital. [Tr. 112].

At approximately 2:28 p.m., the Defendant was handcuffed, secured in leg shackles, wrapped in a blanket, and placed in the back of a cruiser with Shelton. [Tr. 113, 119-20]. Shelton testified that the Defendant was not dressed because the officers "tried to move as quickly as possible." [Tr. 113]; see [Tr. 59] (Steakley testified that the Defendant was naked beneath the blanket when he arrived at the hospital); [Tr. 137] (Dr. Michael LaPaglia testified that the Defendant was not wearing any clothes when he arrived at the emergency room). Shelton testified that during the ride to the hospital the Defendant was "very squirmish," i.e., he was behaving as if "[h]e was still trying to go to the rear end of his body and force something further up into him." [Tr. 113-14].

Shelton and the Defendant arrived at the emergency room of the Methodist Medical Center in Oak Ridge at approximately 2:50 p.m. [Tr. 119-20]; [Exhibit 7 (hospital billing records show the Defendant's admission time as 2:57 p.m., but the "Emergency Nursing Record" shows that the Defendant arrived at 2:50 p.m. and was placed into a room at 3:00 p.m.)]. Ridenour and Steakley were already there awaiting the Defendant's arrival. [Tr. 27]; [Exhibit 6 (showing that Ridenour arrived at the hospital at 2:35:58 p.m.)]. Steakley approached Dr. Michael LaPaglia, the Assistant Director and Attending Physician of the Methodist Medical Center Emergency Department. [Tr. 127, 135]. Steakley told LaPaglia that he "strongly suspected" that the Defendant had drugs in his rectum. [Tr. 127]. LaPaglia ushered the Defendant, Shelton, Ridenour, Steakley, and a fourth police officer into room "ED 20." [Tr. 128, 155]; [Exhibit 7]. LaPaglia explained his duties as an

emergency room physician to the Defendant. [Tr. 129]. Specifically, LaPaglia told the Defendant that he was under a duty to remove any foreign objects that were in the Defendant's rectum. [Tr. 129]. LaPaglia asked the Defendant for his consent to a digital rectal examination ("DRE"). [Tr. 129]; [Exhibit 7 (noting that at 3:00 p.m. "patient refused digital rectal exam by MD")]. The Defendant initially refused, but then agreed to submit to a DRE. [Tr. 130, 145-46].

The Defendant got into the proper position for a DRE, but he contracted his anal and rectal muscles to prevent LaPaglia from getting a finger inside his rectum. [Tr. 130]. LaPaglia attempted to perform a DRE, but he was unable to get his finger through the Defendant's anus.[8] [Tr. 130]. LaPaglia told the Defendant that his failure to cooperate required the administration of a sedative and muscle relaxant to allow for the DRE to proceed. [Tr. 130]. LaPaglia then ordered emergency room nurse Tammy Jones to inject the Defendant with 10 milligrams of Midazolam. [Tr. 130]; [Exhibit 7]. Jones injected the Defendant in his left buttock. [Tr. 139]. LaPaglia testified that 10 milligrams typically sedates an adult enough to relax his full musculature. [Tr. 130].

After waiting "ten to fifteen minutes for the medicine to take full effect," LaPaglia again attempted to perform a DRE. [Tr. 131]. This time, LaPaglia was able to feel a foreign object inside the Defendant's rectum with the tip of his finger. [Tr. 131]. However, the Defendant was still non-cooperative, and LaPaglia was unable to complete the DRE and remove the foreign object. LaPaglia told the Defendant that his continued failure to cooperate required the administration of a combination of medications that would temporarily paralyze every muscle in his body. LaPaglia also told the Defendant that he would be rendered unconscious and intubated to allow for a complete

---

[8] LaPaglia explained the difficulty of performing a DRE on a non-cooperative patient as follows: "If an individual does not want you to enter [his] rectum, you are not going to." [Tr. 140].

DRE.

LaPaglia intravenously administered 20 milligrams of etomidate, a sedative, and 125 milligrams of succinylcholine, a paralytic agent, to the Defendant. [Tr. 142]; [Tr. 155 (Jones testified that intravenous therapy was established at 3:35 p.m.)]; [Exhibit 7]. At approximately 4:12 p.m., the Defendant was intubated. [Tr. 62, 156]; [Exhibit 7]. Once the Defendant was unconscious and completely paralyzed, LaPaglia performed a DRE and removed a rock of crack cocaine weighing 10.2 grams from the Defendant's rectum. [Tr. 27]. Shortly after the rock was removed, Steakley placed it in an evidence bag and left the emergency room. [Tr. 27, 144-45]. The Defendant was intubated for approximately one hour total, during which time he was unconscious for 20 to 30 minutes and completely paralyzed for 7 to 8 minutes. [Tr. 143, 156]. At approximately 6:40 p.m., the Defendant's intravenous therapy was discontinued. [Tr. 155]; [Exhibit 7]. The Defendant was subsequently discharged from the emergency room into Shelton's custody. See [Tr. 125 (Shelton testified that he was told he could leave the hospital with the Defendant at 6:25 p.m., and that he arrived with the Defendant back at the Detention Facility at 6:59 p.m.); [Exhibit 7] (showing the Defendant's departure time as 6:42 p.m.)].

## II. POSITIONS OF THE PARTIES

### A. Motion to Suppress Evidence Obtained During Unconstitutional Compelled Body Cavity Search [Doc. 11]

In his Motion, the Defendant contends that police violated the Fourth Amendment in several ways. First, the Defendant contends that "the scope and duration of the traffic stop unreasonably extended beyond the permissible scope allowed by the Fourth Amendment." [Doc. 12 at 5]. The Defendant essentially agues that the prolongation of the traffic stop amounted to an unreasonable

seizure of his person.

Second, the Defendant contends that Steakley lacked probable cause to arrest him without a warrant. [Doc. 12 at 11-13]. The Defendant argues that the mere fact that he was seated in the passenger seat of a car in which 0.06 grams of marijuana was discovered was "insufficient to establish probable cause" that he had committed a criminal offense. [Doc. 12 at 11-12]. The Defendant concludes that "[b]ecause [his arrest] was invalid and unconstitutional, any evidence obtained as a result of such unconstitutional arrest must be suppressed." [Doc. 12 at 13].

Third, the Defendant contends that the "warrantless compelled body cavity searches," [Doc. 12 at 15], that were performed by LaPaglia "intruded substantially on [his] personal privacy and bodily integrity, in violation of the Fourth Amendment," [Doc. 12 at 16].[9] The Defendant concludes that "the evidence retrieved during these unconstitutional searches must be suppressed." [Doc. 12 at 16].

In response, the Government first contends that the initial traffic stop was lawful because it was "supported by probable cause." [Doc. 24 at 5]. The Government argues that Steakley had

_____

[9] The Defendant alleges that LaPaglia was not the only person who searched his rectum. The Defendant alleges that following his arrest "he was subjected to three inherently invasive body cavity searches, conducted by at least six separate individuals, during a period of approximately four hours." [Doc. 12 at 15]; see also [Doc. 13 at 2] ("[The Defendant] was subjected to three intrusive, compelled, warrantless, and unconstitutional searches of his body and anal cavities, by numerous individuals in violation of his Fourth Amendment protections."). Specifically, the Defendant alleges that (1) Ridenour and Kelly "remov[ed] his pants and examin[ed] his rectum" while in the interview room at the Oak Ridge Police Department, [Doc. 12 at 3], and (2) Shelton and another officer at the Anderson County Detention Facility "forcibly conducted a body cavity search," [Doc. 12 at 4]. See also [Doc. 12 at 21] (stating that Ridenour and Kelly conducted a "forcible search of [the Defendant]'s rectum," and that jail staff at the Anderson County Detention Facility were instructed "to conduct a further search of [the Defendant]'s body cavities"). These two allegations were simply not proved at the suppression hearing. See n.1, *supra*. Accordingly, the Court will discuss only the Defendant's challenge to the lawfulness of the DRE performed by LaPaglia.

probable cause to believe that a traffic violation had occurred because "he saw that the vehicle's registration had expired in October 2009, in violation of Tenn. Code Ann. § 55-3-102." [Doc. 24 at 5].

The Government next contends that the "warrantless arrest of the Defendant was supported by probable cause." [Doc. 24 at 7]. The Government argues that "there was probable cause to believe that the Defendant constructively possessed" the marijuana that was found on the front passenger-side floorboard of the stopped vehicle. [Doc. 24 at 7]. Accordingly, the Government concludes that Steakley's arrest of the Defendant was lawful.

Finally, the Government contends that the "warrantless retrieval of the crack cocaine from the Defendant's rectum was lawful." [Doc. 24 at 8]. The Government argues that the Defendant's behavior coupled with Shelton's observation of something protruding from the Defendant's anus provided "a 'clear indication' that [evidence of criminal activity] would be found" if a DRE of the Defendant was performed. [Doc. 24 at 10 (quoting United States v. Schmerber, 384 U.S. 757, 770 (1966))]. Further, the Government argues that the law enforcement officers present with the Defendant at the Anderson County Detention Facility "were confronted with an emergency, in which the delay necessary to obtain a warrant not only threatened the destruction of evidence, but indeed threatened the Defendant's life." [Doc. 24 at 10] (quotations omitted). The Government concludes that bringing the Defendant to the emergency room for a DRE without first obtaining a warrant was lawful pursuant to the exigent-circumstances exception to the warrant requirement. See [Doc. 24 at 10].

### B. Motion to Suppress Statements of Defendant From February 12, 2010 [Doc. 13]

The Defendant's Motion seeks the suppression of "any statements given by him to officers

on or about February 12, 2010," because such statements were (1) obtained by exploitation of an unconstitutional arrest, (2) "taken in the absence of adequate safeguards to protect [his] Fifth Amendment privilege against self-incrimination," and (3) "involuntary and the product of coercive techniques employed by the officers, including physical coercion." [Doc. 13 at 2]. The Defendant contends that "the facts in this case demonstrate that any statements obtained from [him] by officers on February 12, 2010, were given involuntarily and in the absence of a valid waiver [of his Fifth Amendment privilege against self-incrimination]." [Doc. 14 at 4].

In response, the Government contends that the "Defendant's statements were obtained after a lawful arrest," and that the "Defendant gave a valid, voluntary waiver of his <u>Miranda</u> rights." [Doc. 25 at 2]. Accordingly, the Government concludes that any statements made by the Defendant are admissible.

### III. ANALYSIS

As set out *supra* in part II, the Defendant contends that the rights guaranteed to him by the Fourth and Fifth Amendment were violated in several ways. "The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." <u>United States v. Dice</u>, 200 F.3d 978, 983 (6th Cir. 2000); <u>Mapp v. Ohio</u>, 367 U.S. 643, 654 (1961) ("all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); <u>Weeks v. United States</u>, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). Similarly, statements made by a defendant while in the custody of law enforcement officers are generally inadmissible if the officers violated the rights guaranteed to the defendant by the Fifth Amendment as interpreted

in Miranda v. Arizona, 384 U.S. 436, 444 (1966) (holding that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed"). Stansbury v. California, 511 U.S. 318, 322 (1994) (concluding that "[s]tatements elicited in noncompliance with [the Miranda] rule may not be admitted for certain purposes in a criminal trial"); see also Machacek v. Hofbauer, 213 F.3d 947, 954 (6th Cir. 2000) (holding that "[u]nless a suspect knowingly, voluntarily, and intelligently waives [his Miranda rights], a court will exclude statements made as a result of an involuntary waiver") (citing Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990)).

When determining whether state law enforcement officers have violated the rights guaranteed to a federal defendant by the Fourth and Fifth Amendment, "a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." Elkins v. United States, 364 U.S. 206, 224 (1960). State constitutional and statutory protections are irrelevant to the analysis.[10] See Virginia v. Moore, 553 U.S. 164, 176 (2008) (observing that "state restrictions do not alter the Fourth Amendment's protections"); United States v. Franklin, 284 F. App'x 266, 271 (6th Cir. 2008) (concluding that "state law is irrelevant in federal court when the Exclusionary Rule is at issue. The only applicable law . . . is the Federal

---

[10] Accordingly, the Court does not address the Defendant's arguments that law enforcement officers violated the rights guaranteed to him by the Tennessee state constitution and Tennessee state statutes.

-15-

Constitution").

The Court considers the Defendant's arguments in turn.

## A. Traffic stop

It is uncontested that the initial traffic stop of the vehicle in which the Defendant was riding was lawful. The Court finds that Steakley had probable cause to believe that the driver of the vehicle, Booker, had committed at least one traffic violation: driving a vehicle with expired registration tags. See Tenn. Code Ann. § 55-3-102(a). Accordingly, the Court concludes that the initial stop of the vehicle was lawful. See Whren v. United States, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct")

The Defendant contends that the scope and duration of the traffic stop "unreasonably extended beyond the permissible scope allowed by the Fourth Amendment." [Doc. 12 at 5]. The Defendant essentially agues that the prolongation of the traffic stop to allow for a canine drug detection sniff amounted to an unreasonable seizure of his person.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. A "seizure" of a person within the meaning of the Fourth Amendment occurs when a police officer "by means of physical force or show of authority has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968). "The test for the existence of

a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." California v. Hodari, D., 499 U.S. 621, 628 (1991). In United States v. Mendenhall, 446 U.S. 544, 554 (1980), the Supreme Court established the definitive rule that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of all of the occupants of the vehicle "'even though the purpose of the stop is limited and the resulting detention quite brief.'" Brendlin v. California, 551 U.S. 249, 255 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)); see also Arizona v. Johnson, 555 U.S. __, 129 S. Ct. 781, 783 (2009) (holding that "a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will"); Whren, 517 U.S. at 809-10 (determining that a "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period of time and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment]."); Colorado v. Bannister, 449 U.S. 1, 4 n.3 (1980) (concluding that "[t]here can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment").

In this case, it is clear that the Defendant was seized within the meaning of the Fourth Amendment for the entire period of time "from the moment [the] car [in which he was riding] came to a halt on the side of the road," Brendlin, 551 U.S. at 263, until he was arrested. A reasonable person in the Defendant's shoes would not have felt free to leave at any point during this period of time. Indeed, Ridenour specifically testified that the Defendant was not free to leave. See [Tr. 102]

("[The Defendant] was not free to leave the area that he was in for his safety and my safety."). The question for the Court's resolution is whether the seizure of the Defendant became unreasonable at any point between the initial stop and his arrest.

After initiating a traffic stop, a police officer may not seize an occupant of the stopped vehicle "any longer than is reasonably necessary to issue [a] traffic citation" unless he has "reasonable suspicion that [the occupant] has engaged in more extensive criminal conduct." Townsend, 305 F.3d at 541; see also United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) (holding that "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot"). If the police officer does not have reasonable suspicion that the vehicle's occupants "[are], or [are] about to be, engaged in criminal activity," United States v. Cortez, 449 U.S. 411, 417 (1981), beyond the traffic violation for which the vehicle was stopped, then all of the officer's actions during the course of the stop must be reasonably related in scope to the circumstances originally justifying the stop. Townsend, 305 F.3d at 541 (citing Hill, 195 F.3d at 264 ("[During an ordinary traffic stop] any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference.")).

In this case, the Defendant argues that Steakley unlawfully prolonged his detention beyond the time necessary to investigate and issue a ticket for driving with expired registration tags. The Court disagrees. The length of the traffic stop was lawful because Steakley had better than a reasonable suspicion that more extensive criminal activity was afoot: he in fact had probable cause to believe that marijuana was inside the stopped vehicle from the moment he smelled "the odor of

fresh marijuana" emanating from within the vehicle. See United States v. Garza, 10 F.3d 1241, 1246 (6th Cir. 1993) (finding that a law enforcement officer's smelling the odor of marijuana emanating from within a vehicle constitutes probable cause to believe that there is marijuana in the vehicle); see also United States v. Elkins, 300 F.3d 638, 659 (6th Cir. 2002) (holding that "an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause"). The Government is correct that the character of the traffic stop was "immediately transformed" when Booker first opened the driver door and Steakley smelled the odor of marijuana. [Doc. 24 at 5]. At that point, Steakley was no longer limited to investigating the expired registration tags. The fact that Steakley smelled marijuana, an illegal substance, warranted detaining Booker and the Defendant to investigate the situation further. United States v. Foster, 376 F.3d 577, 586 (6th Cir. 2004) (concluding that "the fact that [the defendant] smelled of PCP, an illegal substance, alone warrants the officers detaining him to investigate the situation further").

The Defendant argues that Steakley did not in fact smell marijuana emanating from within the stopped vehicle. He urges the Court to find both Steakley's testimony and police report untrue:

> In his offense report, Officer Steakley claimed that he "observed the odor of marijuana coming from the enterior [sic] of the vehicle" when Taavian Booker opened the driver's side door. Steakley Report, p.4. However, the video footage from Officer Steakley's cruiser does not support his reported "observation," nor does the 0.06 grams of marijuana recovered during the search of the vehicle. Thus, this alleged observation is not supported by articulable facts, and should not be accredited by the Court to support a finding of reasonable suspicion.

[Doc. 12 at 8].

The Court is not persuaded by the Defendant's argument. The video footage in this case neither corroborates nor undermines Steakley's testimony regarding his smelling the odor of marijuana. Moreover, the fact that only a very small amount of marijuana was seized from the

-19-

vehicle does not give rise to the inference that Steakley was lying.  Steakley specifically testified

that what appeared to be "crumbled up marijuana" was loose on the front passenger-side floorboard

of the vehicle.  [Tr. 19].  Steakley also testified that he did not seize this loose material that he

believed to be marijuana.[11]  [Tr. 45].  Steakley's testimony thus indicates that there was more than

just 0.06 grams of marijuana in the vehicle.  There was no evidence or testimony presented at the

suppression hearing regarding exactly how much material was loose on the floorboard.

The Court finds Steakley's testimony to be credible.  Accordingly, the Court concludes that

the prolonged length of the traffic stop to allow Steakley to perform a canine drug detection sniff

and a subsequent search of the vehicle was reasonable in both duration and scope.


### B.    Drug detection sniff and subsequent vehicle search

The Defendant argues in his post-hearing brief that the Government failed to adequately

establish the drug detection dog's reliability.  The Defendant also argues that probable cause to

search the vehicle was "dependent on stale information" based on the possibility of "residual odors

of narcotics" triggering Argo's alert.  [Doc. 34 at 14].  The Government responds that the search of

the vehicle was justified by Argo's positive alert because the dog is well-trained, certified, and

reliable.

The Supreme Court has held that a drug detection sniff of items located in a public place is

not itself a "search" within the meaning of the Fourth Amendment.  United States v. Place, 462 U.S.

696, 707 (1983).  The Court of Appeals for the Sixth Circuit has clarified that "a canine sniff is not

---

[11] Steakley explained that he did not attempt to collect and seize the loose "crumbled up marijuana" because "it was ground up into the floor."  [Tr. 42]; see also [Tr. 19 ("I also observed crumbled up marijuana that had been crumbled up in the floor.")].

a search within the meaning of the Fourth Amendment" no matter where it occurs, as long as the canine team is "lawfully present at the location where the sniff occurs." United States v. Reed, 141 F.3d 644, 650 (6th Cir. 1998). Whether a canine team is lawfully present at a location depends on whether the individual whose property is to be subjected to a drug detection sniff has a reasonable expectation of privacy in that location. See United States v. Diaz, 25 F.3d 392, 396-97 (6th Cir. 1994) (finding that drug agents using trained dogs to sniff out drugs in a motel parking lot were lawfully present on the parking lot because "the motel guests had no reasonable expectation of privacy in the [lot]").

When a warrantless search has occurred, the Government bears the burden of proving by a preponderance of the evidence that it was justified under one of the recognized exceptions to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Oliver, 686 F.2d 356, 371 (6th Cir. 1982) (holding that "the burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment."); United States v. Matlock, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

In this case, the Government asserted that the search of the Defendant's vehicle fit within the automobile exception, and therefore, the Government bore the burden of proving at the suppression hearing that probable cause existed. It is well established that an alert by a properly-trained drug detection dog is sufficient to establish probable cause for the presence of a controlled substance. United States v. Navarro-Camacho, 186 F.3d 701, 706 (6th Cir. 1998); see also United States v. Page, 154 F. Supp. 2d 1320, 1326 (M.D. Tenn. 2001) (characterizing this holding as well-

settled). It is equally well established that certification of a drug detection dog is *prima facie* proof

of the dog's credibility, which may then be rebutted by evidence regarding the dog's performance

or training. <u>Diaz</u>, 25 F.3d 392, 394-95 (6th Cir. 1994); <u>United States v. Howard</u>, 448 F. Supp. 2d

889, 897-98 (E.D. Tenn. 2006), <u>aff'd</u>, No. 08-6143, 2010 WL 3543174 (6th Cir. Sept. 4, 2010).

Thus, two issues remain: (1) whether the Government has established the canine alerted, and (2)

whether the Government has established the canine was properly trained and reliable.

The undisputed testimony of Officer Steakley is that a valid alert occurred at the Defendant's

automobile providing probable cause to search. Officer Steakley unequivocally testified that Argo

was certified, well-trained, and reliable. Officer Steakley testified that he and Argo were initially

trained in March 2009. At the conclusion of their training, Officer Steakley and Argo were certified

by the National Narcotic Detector Dog Association. In addition, Officer Steakley testified that he

and Argo receive post-certification training and maintain sixteen hours of training per month.

Further, Officer Steakley testified that Argo is approximately ninety-seven percent reliable in

alerting to the presence of narcotics. Recently, in <u>United States v. Howard</u>, the Court of Appeals,

held,

> [t]he primary issue in determining the credibility of a dog's alert is not the capability
> or ability of a dog to accurately identify particular scents, but is instead the
> communication between the handler and the dog based on that indisputable ability.
> This determination in turn rests almost entirely on the credibility of the dog's
> handler's testimony because the handler is the only witness who can speak to the
> subjective interaction during a particular dog alert.

<u>Howard</u>, -- F.3d --- , No. 08-6143, 2010 WL 3543174, *11 (6th Cir. Sept. 4, 2010) (internal

quotations and citations omitted).

Officer Steakley's credible and undisputed testimony, as an experienced and trained canine

handler, was that there was an alert on the Defendant's vehicle by Argo. That drugs were not found

in the searched vehicle does not indicate that Argo is unreliable or that the alert was based on "stale information." [Doc. 34 at 14]. The fact that drugs were not found in the Defendant's vehicle does not necessarily lead to the conclusion the dog falsely alerted. See Howard, 448 F. Supp. 2d at 897-98. Based on Argo's training, Officer Steakley testified that Argo may accurately alert to the odor of narcotics where only the residual odor and not the physical narcotics remain. Given Officer Steakley's testimony about a previous encounter with the Defendant for possessing marijuana, and his testimony about Argo's training, ability, and performance, the absence of drugs is not fatal to a finding that Argo is reliable. See United States v. Torres-Ramos, 536 F.3d 542, 554 (6th Cir. 2008) (citing Diaz, 25 F.3d at 396) (finding that a low percentage of false positives is not necessarily fatal to a finding that a drug detection dog is properly trained and certified)).

This Court finds there is sufficient evidence that Argo is well-trained, certified, and reliable for purposes of establishing probable cause for the search. The use of a drug-detection dog is an accepted investigative technique in the Sixth Circuit and, when a properly trained and certified drug detection dog alerts to an item, the alert alone constitutes probable cause for a search. Diaz, 25 F.3d at 394-95 (6th Cir. 1994); United States v. Lattner, 385 F.3d 947, 951 (6th Cir. 2004), cert. denied, 543 U.S. 1095 (2005). Thus, this Court finds that Officer Steakley, who already had suspicions concerning the Defendant's involvement in criminal activity, had probable cause for the warrantless search of the Defendant's automobile. The alert by Argo formed sufficient basis for probable cause and the subsequent search was legal.

### C.     Pat Down Search of Defendant

The Defendant argues that the pat down search for weapons conducted by Officer Steakley

lacked the "requisite probable cause or reasonable suspicion of criminal activity." [Doc. 34 at 15]. The Defendant specifically argues that the actions of Officer Steakley were "excessively intrusive" based on Argo's alert, resulting in the unlawful seizure of the currency. [Doc. 34 at 14-15], [Doc. 36 at 2].

An officer may pat down the car's driver and passenger "upon reasonable suspicion that they may be armed and dangerous" in order to ensure his safety. Knowles v. Iowa, 525 U.S. 113, 118 (1998) (finding that an officer may conduct a pat down search upon reasonable suspicion that the driver is armed and dangerous). A positive alert by a dog creates at the "very least a reasonable and articulable suspicion" that a person is in possession of illegal drugs. United States v. Ayers, No. 2:06-CR-13, 2006 WL 2672571,*2 (E.D. Tenn. Sept. 8, 2006). As a result of a dog's alert, a routine traffic stop transforms into an investigation regarding drug possession under Terry v. Ohio, 390 U.S. 1(1963). "It is well established that an officer may legally search for weapons if a reasonably prudent officer in the same circumstances would be justified in believing that his safety or that of others was threatened." United States v. Williams, 962 F.2d 1218, 1223 (6th Cir. 1992). Officers that stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions." United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001); see also United States v. Garcia, 496 F.3d 495, 505 (6th Cir. 2007) (concluding a pat-down was reasonable when the officers reasonably suspected the person of drug trafficking).

In this case, Officer Steakley did not conduct a pat down of the Defendant until after the dog alerted to the scent of narcotics on the car. Officer Steakley was entitled to rely on his training and experience that drug dealers frequently carry weapons and, thus, a pat down search of the Defendant

was constitutional.  See United States v. Jacob, 377 F.3d 573, 579 (6th Cir. 2004).  Once Argo alerted on the car, a pat down search of the Defendant was constitutional, and a "failure to do so would have been irresponsible."  Ayers, 2006 WL 2672571, at *2.  Officer Steakley testified that during the pat down he felt "two large bulges" in the Defendant's pockets and "couldn't tell if they were a weapon."  [Tr. 18].  Thus, this Court finds that the seizure of the currency from the Defendant's pockets was the result of a lawful frisk of the Defendant based on Argo's alert.

## C.    Arrest

The Defendant contends that Steakley lacked probable cause to arrest him without a warrant. [Doc. 12 at 11-13].  The Defendant argues that the mere fact that he was seated in the passenger seat of a car in which 0.06 grams of marijuana was discovered was "insufficient to establish probable cause" that he had committed a criminal offense.  [Doc. 12 at 11-12].  Again, the Court disagrees.

A police officer is permitted to make a warrantless public arrest when, based upon the totality of the circumstances, there is probable cause to believe that the arrestee has committed any criminal offense in the officer's presence.[12]  Devenpeck v. Alford, 543 U.S. 146, 152 (2004)

_____

[12] The Defendant's argument that it was illegal under Tennessee state law for Steakley to arrest him for felony possession of marijuana for resale is misplaced.  See [Doc. 12 at 11] ("The amount of marijuana found in [the] car, 0.06 grams, could only support a charge of misdemeanor possession of a controlled substance, requiring a citation in lieu of arrest.").  As explained supra in note 10, Tennessee state law is inapposite.  Moreover, the Court of Appeals for the Sixth Circuit has expressly rejected the argument that a warrantless arrest necessarily violates the Fourth Amendment if it violates Tennessee state law.  United States v. Harness, 453 F.3d 752, 755 (6th Cir. 2006).  In Harness, the Court of Appeals explained as follows:

> Harness also complains that the deputies arrested him for violating Tennessee's sex-offender-registration laws, not for attempted sexual battery.  Noting that a registration violation is a misdemeanor under

(holding that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed"); <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 322 (2001) (concluding that "an officer may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that the offender has committed even a very minor criminal offense in the officer's presence"); <u>see</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 230-31 (1983) (explaining that a probable cause determination must be made with a "totality-of-the-circumstances approach"). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion[.]" <u>United States v. Bennett</u>, 905 F.2d 931, 934 (6th Cir. 1990). "[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." <u>Gates</u>, 462 U.S. at 232. These probabilities "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>Id.</u> at 231.

In this case, the Court finds that Steakley had probable cause to believe that the Defendant was committing a criminal offense, i.e., knowingly possessing a controlled substance. <u>See</u> Tenn. Code. Ann. § 39-17-418(a) (stating "it is an offense for a person to knowingly possess . . . a controlled substance, unless the substance was obtained directly from, or pursuant to a valid

<hr>

Tennessee law and noting that Tennessee law prohibits officers from making warrantless arrests for misdemeanors, Harness argues that his arrest necessarily was illegal. As the Supreme Court has explained, however, an arresting officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."

<u>Id.</u> (quoting <u>Devenpeck</u>, 543 U.S. at 153).

prescription . . . ."). When Steakley searched the stopped vehicle subsequent to Argo's alert, he discovered a plastic baggie containing 0.06 grams of marijuana, a second baggie containing "a green plant-type residue" that Steakley recognized as marijuana residue, a third baggie covered with "powder residue," and loose material that appeared to be "crumbled up marijuana." [Tr. 19-20]. All of these items were found on the front passenger-side floorboard–the area where the Defendant placed his feet while he was seated in the vehicle.

The Court agrees with the Government that "the Defendant's close proximity to the [baggies and loose plant material] . . . at a minimum satisf[ies] a probable cause standard that he constructively possessed the marijuana" that was seized. [Doc. 24 at 8]. See Maryland v. Pringle, 540 U.S. 366, 372 (2003) (holding that "a reasonable officer could conclude that there was probable cause to believe" that a vehicle occupant committed the crime of possession of cocaine "either solely or jointly" when "five plastic glassine baggies of cocaine" were discovered in an area of the vehicle "accessible to all three" of the vehicle's occupants).[13] Accordingly, the Court concludes that Steakley's warrantless arrest of the Defendant was lawful.

### D.    Digital rectal examination

The Defendant contends that the DRE performed by LaPaglia "intruded substantially on [his]

_____

[13] The Defendant's reliance on United States v. Bailey, 553 F.3d 940 (6th Cir. 2009), is misplaced. See [Doc. 12 at 13]. The Defendant is correct that Bailey held that constructive possession of contraband cannot be proved simply by establishing that a defendant was in close proximity to the contraband. 553 F.3d at 947 ("[t]he mere fact that Bailey was driving the car in which police found the firearm is not enough to establish dominion and control over the firearm"). Bailey, however, concerned proving constructive possession at trial, i.e., beyond a reasonable doubt. It said nothing about when *probable cause* exists to believe that a vehicle's occupant was in possession of contraband that is found in the vehicle. Accordingly, Pringle is the relevant precedent.

personal privacy and bodily integrity, in violation of the Fourth Amendment." [Doc. 12 at 16]. In response, the Government contends that the "warrantless retrieval of the crack cocaine from the Defendant's rectum was lawful." [Doc. 24 at 8]. The Government argues that the Defendant's behavior coupled with Officer Shelton's observation of something protruding from the Defendant's anus provided police with "a 'clear indication' that [evidence of criminal activity] would be found" if a DRE of the Defendant was performed. [Doc. 24 at 10 (quoting Schmerber, 384 U.S. at 770)]; [Doc. 33 at 15]. Further, the Government argues that bringing the Defendant to the emergency room for a DRE without first obtaining a warrant was lawful because there was a "clear indication" that the warrantless intrusion to Defendant's body would produce evidence and that exigent circumstances required the immediate intrusion. [Doc. 33 at 14]. The Government concludes that the law enforcement officers present with the Defendant at the Anderson County Detention Facility "were confronted with an emergency, in which the delay necessary to obtain a warrant not only threatened the destruction of evidence, but indeed threatened the Defendant's life." [Doc. 24 at 10 (quotations omitted)]; see also [Doc. 33 at 16].

The Government relies on Schmerber v. California to support its argument that the removal of crack cocaine from the Defendant's body was legal. 384 U.S. 757 (1966); see [Doc. 33 at 14]. In Schmerber, the defendant was arrested at a hospital after an automobile accident in which he was suspected of drinking intoxicating liquor. Id. at 758. A blood sample was withdrawn from the defendant's body at the direction of the police officer. Id. The chemical analysis of the defendant's blood revealed that he was intoxicated. Id. at 759. The defendant argued that the withdrawal of blood violated his Fourth Amendment right against unreasonable searches and seizures. Id. The issue before the Court was whether the police officer was required to obtain a warrant before the

blood test was administered.  Id. at 769.  First, the Court identified that "[i]n the absence of a clear indication that in fact such evidence [would be] found, . . . fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search."  Id. at 770.  If there is a "clear indication" that the evidence is present, the Court then considers whether the police officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant . . . threatened the destruction of evidence."  Id. (internal quotations and citations omitted).

After finding that exigent circumstances could justify a warrantless intrusion beneath the skin, the Court then turned to the question of whether the test chosen was reasonable and if the "test was performed in a reasonable manner."  Id. at 771.  The Court found that "[e]xtraction of blood samples for testing is a highly effective means for determining the degree to which a person is under the influence of alcohol" and that the procedure involved "virtually no risk, trauma, or pain."  Id.  The Court also found it important that the test was conducted by a "physician in a hospital environment according to accepted medical practices."  Id.  Based on the consideration of the above factors, the Court held that the blood-alcohol test resulted in "no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures."  Id. at 772.

Thus, after Schmerber, this Court employs a two-prong test to determine whether a search beneath the skin comports with the Fourth Amendment.  In re Grand Jury Proceedings (T.S.), 816 F. Supp. 1196, 1200 (W.D. Ky. 1993); see also United States v. Berry, 886 F.2d 887, 890-91 (6th Cir. 1989) (analyzing a blood test performed on an unconscious defendant under Schmerber).

Initially, in the absence of a search warrant, the Court must find that an exception to the warrant requirement, such as the presence of exigent circumstances, applies. Grand Jury, 816 F. Supp. at 1200. Added to the exception is the heightened standard that there be a "clear indication" that the evidence will be found. Schmerber, 384 U.S. at 770. Second, the type of procedure and manner in which the search is performed must be reasonable. Grand Jury, 816 F. Supp. at 1200.

In the present case, the Government contends that the facts of this case establish the existence of a "clear indication" that evidence would be found. To support its position, the Government identifies six facts. First, the Defendant clenched his buttocks while Officer Steakley was patting him down for weapons, which raised suspicion because Officer Steakley previously arrested the Defendant after finding marijuana hidden in his crotch area. Second, the Government contends that the empty baggie with white residue on the floorboard gave Officer Steakley reason to believe that evidence was concealed on the Defendant's person. Third, immediately after Officer Ridenour removed the Defendant's handcuffs, the Defendant slammed the door to the interrogation room and blocked the officers' reentry, further arousing suspicion that the Defendant was concealing contraband. Fourth, while the Defendant was being transported to the Anderson County Detention Facility, the Defendant continued to move around in the backseat. Fifth, the strip search of the Defendant resulted in Deputy Shelton observing a small string protruding from the Defendant's anus. Sixth, when Deputy Shelton questioned the Defendant about the presence of contraband in his rectum, the Defendant began moving as though he was trying to push something up his rectum. This Court finds, based on the evidence presented above, that the officers had a clear indication that the Defendant was attempting to conceal contraband in his rectum.

The Government also argues that the officers were confronted with exigent circumstances

excusing the absence of a search warrant. In order to support its argument, the Government focuses on the testimony of Dr. LaPaglia. Dr. LaPaglia testified ten grams of crack cocaine would be a life-threatening amount if absorbed through the Defendant's rectum, which is a "part of the body that absorbs drugs very readily." In addition, Dr. LaPaglia testified that the fact the Defendant was not suffering from a fever or other signs of intoxication would not make Dr. LaPaglia fear any less for the Defendant's life. Beyond the testimony of Dr. LaPaglia, Deputy Shelton testified that the officers were concerned that the drugs in the Defendant's rectum were harmful to his health:

> If he had contraband, which we were pretty sure now he did and we thought it was a form of some type of drug up his rear end[. W]e figured it was a medical situation. We needed to do something about that. It would help him. We didn't want him to harm himself in any way, if it was drugs up his rear end.

[Tr. 111]. Deputy Shelton also testified that they transported the Defendant to the hospital wrapped in a blanket "for his safety[. W]e really wanted to get him to a safe place as quickly as possible, [to] medical personnel." [Tr. 113]. Like the officers in Schmerber, Officers Steakley, Ridenour, and Shelton reasonably "believed that [they were] confronted with an emergency" that could not await the delay involved in obtaining a search warrant. 384 U.S. at 770. This Court finds that exigent circumstances existed that necessitated the Defendant be taken to the hospital for a body cavity search both because (1) the drugs believed to be in his rectum could be readily absorbed and disappear before the officers had time to get a search warrant and (2) the presence of drugs in the Defendant's rectum endangered the Defendant.

The Government's conclusion that the digital rectal examination does not violate the Fourth Amendment is based on the its contention that there was a clear indication that evidence existed in the Defendant's rectum and that exigent circumstances necessitated such a procedure. The

Government, however, does not address the second prong of Schmerber, whether the type and manner of the procedure performed on the Defendant was reasonable. The Defendant cites to Rochin v. California, in which the Supreme Court determined that the officers' conduct in attempting forcibly to remove capsules from the defendant's mouth and then asking medical staff to pump his stomach was "conduct that shocks the conscience" and was constitutionally indistinguishable from "the rack and screw[.]" 342 U.S. 165, 172 (1952). The Defendant argues that the invasive and life threatening procedures performed on him were similarly unreasonable. The Court finds that here, unlike in Schmerber[14] and Rochin,[15] there is no evidence that the officers directed the medical staff to perform any specific type of procedure on the Defendant. Instead, although the officers brought the Defendant to the hospital because of their belief that he had drugs in his rectum, the treating doctor independently determined the manner and means of treatment.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. However, "the Fourth Amendment proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government." United States v. Lambert, 771 F.2d 83, 89 (6th Cir. 1985) (citing United States v. Jacobsen, 466 U.S. 109 (1984)); see also Coolidge v. New Hampshire, 403

---

[14]In Schmerber, the defendant was arrested at a hospital, where he was being treated for injuries sustained in an automobile accident. 384 U.S. at 758. "At the direction of a police officer, a blood sample was then withdrawn from the [defendant's] body by a physician at the hospital." Id.

[15]In Rochin, officers made a forced entry into the defendant's bedroom without a warrant, observed the defendant consume two capsules from a bedside table, and, failing to remove the capsules from his mouth by force, took him to the hospital. 342 U.S. at 166. "At the direction of one of the officers, a doctor forced an emetic solution through a tube into Rochin's stomach against his will[,]" which caused him to regurgitate the capsules. Id.

U.S. 443 (1971); accord United States v. Shahid, 117 F.3d 322, 325 (7th Cir. 1997) (holding that

"[a] search or seizure by a private party does not implicate the Fourth Amendment.  However, the

Fourth Amendment does apply to a search or seizure by a party (even if otherwise a private party)

who is acting as an 'instrument or agent' of the government").  The Court of Appeals for the Sixth

Circuit has established a definitive test for when the actions of a private individual can be considered

"governmental action":

> A person will not be acting as a police agent merely because there
> was some antecedent contact between that person and the police.
> United States v. Coleman, 628 F.2d 961, 965 (6th Cir. 1980).  Rather,
> two facts must be shown.  First, the police must have instigated,
> encouraged or participated in the search.  Id.  Second, the individual
> must have engaged in the search with the intent of assisting the police
> in their investigative efforts.  United States v. Howard, 752 F.2d 220,
> 227 (6th Cir. 1985).

Lambert, 771 F.2d at 89; compare Shahid, 117 F.3d at 325 (explaining that the "two critical factors"

in the analysis of whether a private party is acting as an "instrument or agent" of the government

"are whether the government knew of and acquiesced in the intrusive conduct and whether the

private party's purpose in conducting the search was to assist law enforcement agents or to further

its own ends" (internal quotations and citations omitted)).[16]

With regard to the requirement of intent, the Court of Appeals has "held that a private

individual does not act as a government agent where 'the intent of the private party conducting the

search is entirely independent of the government's intent to collect evidence for use in a criminal

---

[16] The Court of Appeals for the Seventh Circuit has held that "[o]ther useful criteria" for
determining whether a private party is acting as an "instrument or agent" of the government are
"whether the private actor acted at the request of the government and whether the government
offered the private actor a reward."  Shahid, 117 F.3d at 325 (citing United States v. McAllister, 18
F.3d 1412, 1417-18 (7th Cir. 1994)).

prosecution.'" United States v. Robinson, 390 F.3d 853, 872 (6th Cir. 2004) (quoting Howard, 752 F.2d at 227); see also United States v. Foley, 23 F.3d 408, 1994 WL 144445, at *2 (6th Cir. 1994) (unpublished table decision) (observing that "if the intent of the private party conducting the search is independent of the official desire to collect evidence in a criminal proceeding, then the private party is not acting as a state agent"); cf. Williams v. Brann, No. 02-C-940, 2006 WL 2401112, at *5 (E.D. Wis. Aug. 18, 2006) (unreported opinion) (rejecting the argument that "private actors can unknowingly be manipulated into becoming state actors" because "case law relating to Fourth Amendment searches and seizures requires some knowledge on the part of the private actor of the government's control").  Further, "there is no seizure within the meaning of the Fourth Amendment when an object discovered in a private search is voluntarily relinquished to the government" by the individual who found it.  Coleman, 628 F.2d at 966.

Applying Lambert's two part test to the facts in this case, the Court finds that Dr. LaPaglia was not acting as an agent of the government when he performed the DRE during which a rock of crack cocaine was removed from the Defendant's rectum.  Although it is arguable that Officers Shelton, Steakley, and Ridenour "instigated, encouraged, or participated in" the DRE, Lambert, 771 F.2d at 89, it is clear that Dr. LaPaglia did not perform the DRE "with the intent of assisting the police in their investigative efforts."  Id.  Dr. LaPaglia testified as follows: "The whole purpose of me doing this exercise[, the DRE,] was to assure that there was not anything dangerous in the patient's rectum."  [Tr. 145].  The Court thus finds that Dr. LaPaglia's intent was "entirely independent of the government's intent to collect evidence for use in a criminal prosecution." Howard, 752 F.2d at 227.

Throughout his cross-examination, Dr. LaPaglia unequivocally maintained that he "was not acting under the direction of the officers."[17]  [Tr. 136].  LaPaglia explained that his actions were motivated by his duty as an emergency room physician: "I routinely have to deal with patients that I suspect may be in danger because they have ingested something or because they have a foreign object in their body.  If I suspect that, then I have to do whatever it takes to make sure that individual does not harm [himself]."  [Tr. 148]; see also [Tr. 129 (stating that once the Defendant was in the emergency room, "he really did not have a choice" with regard to whether a DRE would occur "because if my suspicion was high enough to think that he had some sort of dangerous substance in

---

[17] Dr. LaPaglia's most piquant testimony was as follows:

| | |
|---|---|
| MR. JOLLEY: | Dr. LaPaglia, you were doing this at the officer's direction, is that correct? |
| LAPAGLIA: | No. |
| MR. JOLLEY: | Did they not bring it to your attention? |
| LAPAGLIA: | They did. |
| MR. JOLLEY: | And were they not present supervising what happened? |
| LAPAGLIA: | Yes, they were. |
| MR. JOLLEY: | And were they not the people who brought [the Defendant] there to direct you to do this operation? |
| LAPAGLIA: | They brought the Defendant there, but they did not direct me to do anything. |

[Tr. 133-34].

his rectum, then it was my duty to get it out")].  Dr. LaPaglia further explained that he conducted a DRE of the Defendant because he was concerned that the Defendant was in danger–not because he intended to assist the police with their investigation.  See [Tr. 148 ("The background information that I was given by the officers was that they suspected [the Defendant] had drugs in his rectum. That gave me suspicion enough to think that he was in danger.")]; [Tr. 143 (stating that after the second attempt at performing a DRE, "I was very certain that [the Defendant] had an object [inside of him] and whether it's a drug or an object, it needs to come out of the rectum.")].  Based upon this testimony, the Court concludes that the DRE in this case was not a search within the scope of the Fourth Amendment's protections because it was conducted by a private actor.

In the event that the District Court finds that Dr. LaPaglia was acting at the officers' direction and was, therefore, a government agent, the Court will briefly conduct an alternative analysis of whether the DRE was reasonable under the circumstances and was conducted in a reasonable manner.  In Schmerber, the Court balanced three factors to determine whether the search was reasonable: "(1) 'the extent to which the procedure may threaten the safety or health of the individual'; (2) 'the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity'; and (3) 'the community's interest in fairly and accurately determining guilt or innocence.'" United States v. Husband, 312 F.3d 247, 253 (7th Cir. 2002) (quoting Winston v. Lee, 470 U.S. 753, 761-62 (1985) (analyzing the reasonableness of surgery to remove a bullet from the defendant's chest under the Schmerber factors)).  The Court will analyze each of these factors in light of the facts of this case.

The first factor addresses the impact of the procedure employed on the defendant's health and safety.  Lee, 470 U.S. at 761; Schmerber, 384 U.S. at 771; Husband, 312 F.3d at 254.  In the

present case, the Defendant emphasizes Dr. LaPaglia's testimony that the procedures employed were "potentially" fatal. He suggests that far less intrusive and risky procedures were available, such as x-raying his abdomen and monitoring his bowel movements over time. Dr. LaPaglia testified that because the Defendant would not relax his rectal muscles to permit the DRE, even after administration of a local muscle relaxant, he administered a sedative (20 milligrams of Etomidate) and a paralyzing drug (125 milligrams of Succinycholine) and intubated the Defendant to sustain his breathing during the DRE. [Tr. 131, 141-42] On cross-examination, Dr. LaPaglia agreed that if the Defendant had not been intubated, the medications he administered were "potentially" fatal. [Tr. 142]

    In contrast with this risk associated with the administration of the medications, Dr. LaPaglia also testified repeatedly that narcotics in a person's rectum were potentially fatal. [Tr. 127 (a person's "life can be in danger because of" drugs in their rectum), 129 (he explained to the Defendant that he had to remove any drug from his rectum "because his life could be in danger"), 132-33 (a narcotic could "absolutely" be life threatening even if the person did not have a fever or symptoms of intoxication), and 133 (ten grams of crack cocaine inside a person's rectum would be life-threatening "[w]ithout a doubt")]. Based upon this testimony, the Court finds that the risk of Dr. LaPaglia *not* removing the drugs from the Defendant's rectum was substantial and outweighed the potential risk from the medications, which were not used in the absence of intubation. See Husband, 312 F.3d at 254 (affirming the findings of the district court that "the risk involved in administering the Etomidate [to cause the Defendant to relax his mouth so that drugs could be removed] was relatively low"). This factor weighs in favor of a finding that the DRE was reasonable.

The second factor the Court examines is "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity[.]" Lee, 470 U.S. at 761. In examining this factor, the Supreme Court observed that society generally accepted blood tests, such as that employed in Schmerber, as commonplace and not unduly intrusive, Id. at 762, in sharp contrast to the stomach pumping in Rochin, which violated the defendant's "human dignity," id. at 763 n.5. The Court finds that the DRE employed in this case was extremely invasive of the Defendant's personal privacy interests and his bodily integrity. Like a forced stomach pumping, a forced digital rectal examination, while paralyzed, may shock the conscience.

On the other hand, the Court finds Dr. LaPaglia's belief that the procedures were medically necessary is relevant to the application of this second factor. A reasonable person may also be shocked by the failure of medical personnel to render necessary medical aid, which could result in death, to a individual in custody. See generally Estelle v. Gamble, 429 U.S. 97, 104-05 (holding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment . . . [regardless of] whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"); Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976) (reasoning that the deliberate indifference of prison authorities to a prisoner's obvious need for medical aid violates Due Process because the prisoner cannot himself seek medical aid by virtue of his imprisonment). Moreover, the extensive nature of the procedures required to remove the drugs from the Defendant's rectum were necessitated by the Defendant's persistent refusal to cooperate with less extensive procedures. Compare County of Sacramento v. Lewis, 523 U.S. 833, 835 (1998)

(reasoning that officer's behavior during high-speed chase fails to meet the "shocks-the-conscience test" in part because the officer was not to blame for the driver's "outrageous" and "lawless" behavior). Thus, the Court finds that this factor weighs only slightly in favor of a finding that the DRE was unreasonable.

Finally, the Court assesses "the community's interest in fairly and accurately determining guilt or innocence." Lee, 470 U.S. at 762. In Lee, the Court held that the prosecution failed to show a "compelling need" for the evidence in question–a bullet lodged in the defendant's chest that could be linked to the victim's gun–because of other available evidence, including the victim's identification of the defendant. Id. at 765-66. In contrast, the Court in Schmerber held that the blood test was a "highly effective" method of determining the defendant's blood-alcohol content and the officers had a "clear indication" that the blood test would reveal the evidence sought. 384 U.S. at 771, 773. In light of these facts, the blood test results were vitally important to the state's ability to enforce its DUI laws. Lee, 470 U.S. at 763 (analyzing Schmerber). In the present case, the crack cocaine removed from the Defendant's rectum is the central piece of evidence supporting his charges. The DRE was a highly effective, and medically necessary, means of obtaining this evidence. This Court has already found that the officers had a "clear indication" that the Defendant had drugs in his rectum. The fact that these drugs could have been readily absorbed into the Defendant's body if not removed provides a compelling need for the procedure employed. This factor weighs in favor of a finding that the DRE was reasonable.

Balancing these three factors, the Court finds that the DRE was a reasonable procedure under the circumstances and was reasonably employed, particularly given the risk to the Defendant from

the drugs in his rectum and the Defendant's actions hindering their removal. Accordingly, the Court

finds that the search in question did not violate the Defendant's Fourth Amendment rights.


### E. Provision of **Miranda** warnings

The Defendant alleges that police did not adequately provide "safeguards to protect [his]

Fifth Amendment privilege against self-incrimination." [Doc. 13 at 12]. Specifically, the Defendant

alleges that he was never apprised of the rights he is guaranteed under Miranda. The Defendant

testified that he never heard any officer advise him of his Miranda rights. [Tr. 159].

The Court does not credit the Defendant's testimony and it rejects his allegation. The Court

finds that Steakley's testimony regarding his questioning of the Defendant and the provision of

Miranda warnings was credible. Steakley testified that at the scene of the traffic stop, the Defendant

was only questioned about whether he had weapons on his person. [Tr. 73]. Steakley specifically

testified that he did not ask the Defendant any other questions at the scene. [Tr. 73]; [Tr. 64 (on

cross-examination, Steakley stated that he "didn't attempt to question [the Defendant] at the

scene")]. Steakley also testified that he read the Defendant his Miranda rights before questioning

him at the Oak Ridge Police Station. See n.5, *supra*; [Tr. 22, 63]. Steakley explained that he

followed the preferred procedure in the Sixth Circuit for provision of Miranda warnings, i.e., he read

the warnings from a prepared card. [Tr. 22, 63]; see United States v. Tillman, 963 F.2d 137, 141-42

(6th Cir. 1992) (recommending that police read Miranda warnings from a prepared card because this

approach "reduces the chances of error, assists a police officer in the performance of his duties, and

protects the rights of innocent citizens as well as those accused").

Based on Steakley's credible testimony, the Court finds that the Defendant was adequately apprised of his "Fifth Amendment privilege against self-incrimination," [Doc. 13 at 2], in compliance with <u>Miranda</u>, 384 U.S. at 444 (holding that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed"). Accordingly, the Court concludes that any statements made by the Defendant are not inadmissible by reason of having been made before <u>Miranda</u> warnings were given.

### F.    Waiver of the right to remain silent

The Defendant alleges that even if Steakley did read him <u>Miranda</u> warnings, he never waived his right to remain silent. <u>See</u> [Doc. 14 at 4 ("[A]ny statements obtained from [the Defendant] by officers on February 12, 2010, were given involuntarily and in the absence of a valid waiver.")]. The Court again rejects the Defendant's allegation. Steakley specifically testified that after being read his <u>Miranda</u> rights, "[the Defendant] stated that he did understand and he did want to speak with me." [Tr. 22]; <u>see</u> n.5, *supra*. The Court finds Steakley's testimony to be credible, and it concludes that the Defendant provided a knowing, voluntary, and intelligent waiver of his right to remain silent.[18] <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (explaining the factors to be considered

---

[18] The Defendant points out that he never signed a form indicating that he wished to waive his right to remain silent. This fact is inapposite. <u>See</u> <u>United States v. Miggins</u>, 302 F.3d 384, 397 (6th Cir. 2002) (stating that no authority can be found "for the proposition that a written waiver is necessary to establish a knowing, intelligent, and voluntary waiver of <u>Miranda</u> rights").

when determining whether a defendant waived a <u>Miranda</u> right).  Accordingly, any statements made by the Defendant are not inadmissible by reason of having been made without a valid waiver of the right to remain silent.  <u>See</u> <u>Machacek</u>, 213 F.3d at 954 (explaining that statements are not excluded if a suspect knowingly, voluntarily, and intelligently waives his right to remain silent).

### G.    Absence of evidence of coercion

The Defendant alleges that any statements that he made to law enforcement officers were "involuntary and the product of coercive techniques employed by the officers, including physical coercion." [Doc. 13 at 2].  The Court rejects this allegation.  The Defendant failed to produce any evidence other than his own testimony that coercive techniques or physical coercion were used to elicit statements.  The Defendant also failed to specify any particular statements that were obtained through the use of coercive techniques.  The Defendant's only testimony regarding how he was questioned under coercive conditions was as follows:

| | |
|---|---|
| MR. JOLLEY: | [After you were strip searched at the Anderson County Detention Facility] what happened? |
| DEFENDANT: | Then they put me in this strap chair and just had me sitting there for an additional 15 or 20 minutes. |
| MR. JOLLEY: | The strap chair you are talking about, how are you dressed when you were put in the strap chair? |
| DEFENDANT: | Buck naked. |
| MR. JOLLEY: | And then what happened? |
| DEFENDANT: | They had me just sitting there just talking to me and telling me they are going to do this and they are going to do that to me.  The next thing |

> I know they are saying that they are going to
> take me to the hospital.

[Tr. 161-62].

This testimony is contrary to the consistent testimony of Ridenour and Shelton, and the Court finds that it is entitled to little weight. More importantly, the testimony does not establish that the Defendant was actually questioned, or that he made any statements in response to questioning. Accordingly, the Court concludes that the Defendant has not shown that any statements should be suppressed because they were obtained through coercion.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Defendant's Motion to Suppress Evidence Obtained During Unconstitutional Compelled Body Cavity Search **[Doc. 11]** and Motion to Suppress Statements **[Doc. 13]** be **DENIED**.[19]

Respectfully submitted,


    s/ H. Bruce Guyton
United States Magistrate Judge

---

[19]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (affirming the Court of Appeals for the Sixth Circuit rule "conditioning appeal, when taken from a district court judgment that adopts a magistrate's recommendation, upon the filing of objections"). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review.  Smith v. Detroit Fed'n of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).